IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 17, 2012 Session

## LONNIE LEE OWENS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Franklin County**
**No. 15356    Buddy D. Perry, Judge**

---

**No. M2011-02188-CCA-R3-PC - Filed April 4, 2013**

---

The Petitioner, Lonnie Lee Owens, appeals the Franklin County Circuit Court's denial of his petition for post-conviction relief from his convictions for second degree murder, abuse of a corpse, and theft over $10,000 and his effective twenty-four-year sentence.  On appeal, he contends that (1) counsel was ineffective by failing to object to an erroneous statement contained in the presentence report and by failing to include the trial transcript in the appellate record, (2) counsel was ineffective in cross-examining the medical examiner, (3) counsel was ineffective by attempting to negotiate a plea agreement in the jury's presence, (4)  counsel was ineffective by failing to request a jury instruction on lesser included offenses, (5) counsel was ineffective by failing to interview a witness before the trial, (6) counsel was ineffective by failing to request a change of venue, (7) counsel was ineffective by failing to file a motion for a new trial and by failing to appeal his conviction, (8) the cumulative effect of counsel's errors deprived him of the effective assistance of counsel, and (9) he is entitled to a delayed appeal.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

M. Keith Davis, Dunlap, Tennessee, for the appellant, Lonnie Lee Owens.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; James Michael Taylor, District Attorney General; and Steven M. Blount, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Although the Petitioner did not appeal his conviction, he sought appellate relief from his sentence, but the trial transcript was not included in the appellate record. This court summarized the facts of the case based on the sentencing hearing transcript and presentence report. The court stated:

> The Defendant killed his estranged wife, Heather Owens, in May 2003 when she came to his house to pick up their two young children. The Defendant struck the victim and then bound her with duct tape. The Defendant wrapped duct tape over the victim's mouth and nose, such that she suffocated to death. The couple's children were in the house at the time of the homicide. The Defendant subsequently buried the victim's body and disposed of her pick-up truck. The Defendant's girlfriend assisted in the disposal of the victim's truck.

State v. Lonnie Lee Owens, No. M2005-00362-CCA-R3-CD, slip op. at 1-2 (Tenn. Crim. App. Oct. 18, 2005).

At the post-conviction hearing, the Petitioner testified that trial counsel did not file a motion for a new trial, that counsel knew the motion was required before he could appeal his convictions, and that he did not know counsel did not file the motion. He denied signing a waiver of his right to appeal his convictions and said he wanted to appeal his second degree murder conviction. He said that counsel did not file a petition for a writ of error coram nobis and that he learned of the writ when he began conducting his own legal research. He said that he wrote letters to counsel after he was convicted but that he did not make any statements that might have led counsel to believe he did not want to appeal his conviction. He said he did not know counsel failed to prepare a trial transcript until he received this court's opinion. He said he received a copy of the opinion from counsel several months after it was filed.

The Petitioner testified that he received a copy of the appellate brief filed by trial counsel and that he was "shocked" counsel did not appeal his conviction. He said he wrote numerous letters to counsel but did not know the extent to which he discussed counsel's failure to appeal his convictions. With regard to counsel's opening statement during the trial, the Petitioner stated that he objected to counsel's pleading for the jury to convict him of voluntary manslaughter. He denied knowing counsel was going to ask the jury to convict him of manslaughter and said he thought the theory was self defense. He denied signing a waiver to exclude certain trial strategies. He stated that his meetings with trial counsel lasted approximately ten to fifteen minutes and that two or three months elapsed between meetings. He said strategy was never discussed during those meetings. He said counsel only told him

that he would be "convicted of something." He understood that the theory was self defense.

The Petitioner testified that after he was convicted, he learned that Dr. Charles Harlan, the medical examiner who performed the victim's autopsy, was permanently prohibited from practicing medicine on May 4, 2005. A copy of the order revoking Dr. Harlan's medical license was received as an exhibit. The order shows numerous instances of inadequate medical examinations and documentation and erroneous medical findings by Dr. Harlan. The order also shows erratic and unprofessional conduct by Dr. Harlan. The Petitioner said he learned this information on his own, not through counsel. The Petitioner identified a letter he wrote to counsel stamped filed May 12, 2005. He said that in his letter he asked counsel if he planned to raise Dr. Harlan's losing his license on appeal. The letter identified the article discussing Dr. Harlan.

The Petitioner testified that before the trial, he became concerned about his receiving a fair and impartial jury in Franklin County and that he discussed this with trial counsel. He said that he was told counsel was going to file a motion for a change of venue but that counsel never filed it. He said many of the jurors had previous knowledge about his case, knew the police officers involved, and discussed the case with those officers.

The Petitioner testified that he chose to testify at the trial and that he attempted to cooperate with trial counsel in preparing for the trial. He said he and counsel discussed the victim's affairs and the threats and extortion demands he received from her family, but counsel did not mention these points at the trial. The Petitioner identified letters he wrote to counsel, which stated that his pastor could testify that the Petitioner took a Smith & Wesson .357 home for protection because he received threats after hiring a private investigator. Another letter stated that his pastor could testify that the Petitioner parked behind his church to prevent trouble with the victim and Don and Sandy Griffin.

The Petitioner testified that Barry Rhoads,[1] the Petitioner's pastor, testified at the trial and that trial counsel did not ask Mr. Rhoads about the threats and extortion demands the Petitioner received from multiple people who were members at his church. He said Mr. Rhoads knew about the victim's affairs. He said that the victim and Sheriff's Deputy George Dyer pointed a gun at him and told him to forget about the victim, their house, and their children. He said that they told him to leave the area and that he would begin to have legal troubles if he did not leave. He denied knowing the victim obtained an order of protection until church members told him about the order and denied ever being served. He denied knowing his marriage was in trouble. He said the victim and Deputy Dyer were distant

---

[1] We note that the witness's name is spelled "Rhodes" in the post-conviction hearing transcript and "Rhoads" in the trial transcript. We use the spelling the witness gave in his trial testimony.

cousins by marriage. He said he filed for divorce and was served with an order of protection by Deputy Dyer. He said the victim displayed "erratic behavior" and had an affair with Sheriff's Deputy Brian Brewer. He said that he told counsel about these events before the trial but that they were not discussed at the trial.

The Petitioner testified that he stopped attending his church because of threats from the victim and her family and that he began attending Mr. Rhoads's church. He said the victim and her family told him to stop attending Mr. Rhoads's church, too, because they did not like Mr. Rhoads. He said he parked his car behind Mr. Rhoads's church to avoid problems with the victim and her family.

The Petitioner testified that the night of the victim's death, he was inside his home with his children, that someone approached him from behind, that the person said, "F--- you," and that he reacted by "throwing a punch without realizing" it was the victim. He said that after one year of the tension, he was under duress and feared for his and his children's safety. He said he told trial counsel his version of events. He understood his actions were self defense. He agreed that he testified at the trial that he checked for a pulse but that the victim was dead. He said he did not call 9-1-1 because he knew about the victim's and her family's connections with the police and feared getting "a raw deal" and what would happen to his children. He said he knew the victim's family would attempt to obtain custody of his children.

The Petitioner identified letters he wrote trial counsel identifying potential witnesses. He said none of these potential witnesses testified at the trial, and he did not know if counsel interviewed them. He denied counsel's informing him of the potential witnesses they interviewed and denied counsel gave him a copy of the State's discovery package. He did not know if the State made counsel aware of any problems with Dr. Harlan.

The Petitioner testified that the presentence report stated that Dr. Harlan concluded that there were traces of duct tape in the victim's lungs and that the Petitioner did not know of any evidence supporting Dr. Harlan's conclusion. He said his attorney did not object to the conclusion being in the presentence report.

On cross-examination, the Petitioner identified a letter dated February 5, 2005, from trial counsel to the circuit court clerk stating that a motion for a new trial would not be filed and that the sentence was the only issue to be appealed. He agreed the letter showed that a copy was sent to the Petitioner but said he never received the letter. He said he believed the letter was intentionally withheld, although he did not know if it was withheld by counsel or by the correctional officers.

The Petitioner testified that he did not meet with trial counsel after he was sentenced and that he wanted counsel to appeal his conviction and sentence. He denied his twenty-four-year sentence was a "pretty good" outcome. He admitted that he met with counsel at his home to prepare his trial testimony briefly and that he met with counsel to discuss trial strategy. He denied, though, that counsel told him there would be an admission to manslaughter and said that he thought the strategy was self defense.

The Petitioner testified that during his trial testimony, he discussed the contested divorce and his and the victim's problems. He said he did not know the victim was in his house when he punched her. He denied knowing that counsel knew about Dr. Harlan's issues with the state medical board. He recalled counsel's cross-examining Dr. Harlan about his conclusion that the victim died as a result of suffocation and the lack of petechial hemorrhaging. He said that many subjects, though, were not covered during cross-examination, including the medical board's investigation.

The Petitioner testified that he was present for jury selection and that the trial court asked the potential jurors questions about their prior knowledge of the Petitioner's case. Although he recalled potential jurors who said they knew about the Petitioner's case, he could not recall whether any of those potential jurors were on the panel. He recalled that potential jurors who stated they could not be impartial and had already reached a conclusion about the Petitioner's guilt were excused from service.

The Petitioner testified that the victim had an affair but denied that he had an affair. He said he began dating someone after he filed for divorce. He said that Mr. Rhoads's testimony was "jumbled up and mixed up and was not brought out accurately." He said counsel should have been prepared and talked to Mr. Rhoads before the trial. He said that the manner in which counsel asked Mr. Rhoads questions misrepresented the facts, but he agreed Mr. Rhoads testified truthfully.

The Petitioner testified that the victim and her family attempted to control and manipulate him. He acknowledged his trial testimony that he did not call 9-1-1 because he panicked. He said he did not testify that he feared he would get "a raw deal" because he feared retaliation from Deputies Dyer and Brewer and the victim's family. He denied lying during his trial testimony and said he withheld some of the facts.

The Petitioner testified that the potential witnesses he provided trial counsel would have been character and fact witnesses and that he only provided general information. A list of questions the Petitioner prepared for each of the twenty-four people he wanted counsel to call as witnesses was received as an exhibit.

The Petitioner testified that the trial court did not mention the particles found in the victim's lungs during the sentencing hearing and agreed that this court affirmed his sentence on grounds unrelated to the particles in the victim's lungs. He agreed this court concluded that the Defendant bound the victim's hands and feet and covered her face with duct tape. He said, though, that without the trial transcript, this court only had the "misguidance of the contradicting reports." He agreed he bound the victim's hands and feet with duct tape and bound her face "all the way up her forehead." He agreed the children were in the home sleeping when the victim was killed. He agreed he testified that he buried the victim's body in a shallow grave on an island in the Tims Ford Lake area and that he later had sex with his girlfriend. He said his girlfriend clarified at the trial that they did not have sex later that night. He could not recall if information about the duct tape particles inside the victim's lungs was presented at the trial. He said, though, that this court noted the discrepancies between the presentence report and the autopsy reports.

On redirect examination, the Petitioner testified that he and the victim did not live together at the time of the victim's death and that they had been separated for almost one year. He said that although he and the victim agreed that they would not enter each other's home, the victim and her mother violated that agreement several times. He said he understood that this court enhanced his sentence based upon a finding that the victim was treated with exceptional cruelty. He agreed this court concluded that the victim struggled to breathe, suffocated to death, and suffered while she fought to survive and that the victim's death was the result of the method he used to kill the victim. He said that Dr. Harlan did not testify that the victim struggled and agreed that Dr. Harlan gave no opinion with regard to whether the victim was conscious. He noted that the victim suffered serious injuries from a car accident, including a broken leg, before she died and that Dr. Harlan did not mention those previous injuries.

Barry Rhoads testified that he was a bi-vocational pastor and an engineer, that he ministered to the Petitioner and the victim, and that he testified at the trial on the Petitioner's behalf. He said trial counsel did not interview him before the trial. He said he spoke to the Petitioner as his pastor twice between the time the victim disappeared and the time her body was found. He said that during those conversations, the Petitioner told him about the threats he received and that he listened to one threat that was recorded on the Petitioner's answering machine. He said it was a male voice telling the Petitioner to "stop this, stop that, and if he didn't there was going to be consequences." He said it was not a friendly message and considered it to be a threat. He said the Petitioner told him there had been other messages, too. He said the Petitioner told him that he was followed on at least two occasions, that someone damaged his home, and that someone broke into his home through the back door.

Mr. Rhoads testified that before the victim's death, the Petitioner brought his guns to Mr. Rhoads's home for safekeeping. He said the Petitioner feared that the victim would take and sell the guns. He said that before the victim's death, the Petitioner requested one of the handguns because the Petitioner feared for his life. He recalled the Petitioner's parking behind the church and said the Petitioner told him that he parked there to prevent the victim's seeing him and "causing a scene." He recalled the Petitioner's telling him about the Petitioner's tires being slashed before the victim's death. He said the Petitioner believed it was an act of vandalism because it was on the sidewall of the tire and looked like a knife or a sharp objected was used to puncture the tire. He said counsel did not ask about these events.

Mr. Rhoads testified that the Petitioner's trial was a "hot topic of conversation" in Franklin County and that he was concerned whether the Petitioner could receive a fair trial. He agreed the victim's parents were well known.

On cross-examination, Mr. Rhoads testified that counsel told him they wanted to call him as a witness at the trial but that counsel did not discuss pastoral privileges with him. He said that he testified truthfully at the Petitioner's trial and that the information he knew came from the Petitioner. He said he knew the victim and her family through the church community. He said they were well known outside the church community.

Trial counsel testified that he had practiced law for about thirty years and had handled several criminal appeals. He said he did not find in his case file any documentation showing that the Petitioner waived his right to appeal his conviction and did not recall receiving a waiver from the Petitioner. He said co-counsel was a former member of his law firm and no longer practiced law with him. He said that he and co-counsel divided the work in preparing for the trial and that they each had their respective responsibilities. He said they worked together on the case. He said co-counsel took responsibility for the sentencing hearing and the appeal.

Trial counsel testified that he did not have a copy of the trial transcript in his case file and that he did not think he ever received a copy. He said that he thought he and co-counsel believed it was in the Petitioner's best interest not to include the trial transcript in the appellate record. With regard to the presentence report, counsel recalled that the report included a statement that Dr. Harlan found traces of duct tape in the victim's lungs and that he did not recall if that was the first mention of traces of duct tape being found there. He agreed no objections were made to the statement.

Trial counsel testified that the Petitioner was actively involved in his defense and that he provided names of witnesses to testify at the trial on his behalf. He said he, co-counsel, and co-counsel's assistant interviewed everyone on the list who "had anything positive" that might have helped the case. He said he did not recall speaking with any of the pastors included in the list and did not find any memorandum in the case file showing he talked to them. He said that if someone provided relevant information, a memorandum would have been prepared for the file and that a memorandum might not have been prepared if someone did not have relevant information.

Trial counsel identified a letter from the Petitioner about Mr. Rhoads's testifying at the trial and said that he and co-counsel reviewed the Petitioner's letters. He recalled a discussion about the Petitioner's receiving threats before the victim disappeared and said he and co-counsel reviewed the Petitioner's divorce file with his divorce attorney and used the relevant information. He said that self defense was "not really consistent" with the facts of how the Petitioner said the killing occurred. He said the Petitioner stated that

> somebody came up behind him in his house. He knew that his wife was coming, because she had called him, and said she was coming by the house, and he knew she was coming. Someone came in the house. He turned around and hit this person multiple times, knocking them out, then realized it was [the victim]. . . .

He said the Petitioner thought the victim was dead and "for some reason" placed duct tape around her face, nose, and mouth, and hid the body in the shed. He agreed that if the jury believed those facts, it might have convicted the Petitioner of reckless or negligent homicide. He said, though, the problem was the Defendant's placing duct tape on the victim after she was dead, which prevented arguing self defense or negligent homicide.

Trial counsel testified that co-counsel interviewed Dr. Harlan before the trial. He identified co-counsel's notes from the interview. He agreed co-counsel's notes stated that Dr. Harlan said less than ten of the 20,000 autopsies he had performed involved the use of duct tape and that the victim was already dead in "most of those cases." He agreed that the notes stated that Dr. Harlan "seem[ed] to suggest that the [d]uct tape [was] the only evidence of . . . asphyxiation." Counsel did not recall if Dr. Harlan was asked whether the victims in the ten cases involving duct tape were dead before or after the tape was applied. He did not recall if Dr. Harlan testified that he did not find any petechial hemorrhaging in the lungs, eyes, neck, and face.

Trial counsel testified that the Petitioner's case was well publicized and that he did not recall discussing a change of venue with the Petitioner. He did not recall the prospective jurors stating that they were familiar with the Petitioner's case and said a jury was picked from the people called for jury duty. He agreed the trial transcript showed that a discussion was held about "virtually every juror [who] . . . raised their hands that they'd had some exposure" to the Petitioner's case. He denied being concerned about the Petitioner's ability to receive a fair trial in Franklin County. He did not recall that one of the jurors said he heard the case involved a "heinous crime." He recalled one juror was the victim's co-worker and said counsel had a previous connection with the juror, although he could not recall how he knew the juror. He said he and co-counsel were "comfortable" with the jury.

Trial counsel testified that he knew Dr. Harlan was no longer the medical examiner and that he had been disciplined by the medical board. He said co-counsel learned of Dr. Harlan's problems before the trial and recalled discussing "articles . . . about some problems . . . or allegations." He said that he understood there were allegations against Dr. Harlan but that the medical board had not made a final determination. He agreed that it would be "beneficial to impeach witnesses who have previously been adjudicated to have made false statements, false representations, and engaged in conduct constituting fraud and deceit." He said, though, that co-counsel believed Dr. Harlan would provide some beneficial testimony and that Dr. Harlan provided beneficial information. He said that impeaching a witness who gave favorable information was a judgment call. He agreed the sole medical expert was Dr. Harlan. He said co-counsel talked to Dr. Harlan more than once before the trial.

On cross-examination, trial counsel testified that he participated in many meetings with the Petitioner. He said that during opening statements, co-counsel told the jury that the Petitioner was guilty of manslaughter, that the statement was part of their strategy, and that he and co-counsel discussed with other attorneys in their firm whether to make such a statement. He said the discussions occurred long before the trial. He agreed the strategy was successfully used by another member in their firm. He said that the strategy was discussed with the Petitioner and that the Petitioner agreed with it. He said asking the jury for a manslaughter conviction was consistent with the Petitioner's disposing and burying the victim's body in a remote location.

Trial counsel testified that although co-counsel worked on the appeal, he and co-counsel discussed what might be appealed. He said they agreed that the best opportunity for appellate relief was to appeal the sentence. He agreed this court reversed the trial court's ordering consecutive sentences and ordered concurrent sentences. He said the Petitioner's sentence was reduced from thirty to twenty-four years.

-9-

Trial counsel testified that there were no communication problems with the Petitioner. With regard to the list of witnesses the Petitioner provided counsel before the trial, counsel said that his office investigated the witnesses but that none of the witnesses knew anything about the victim's murder. He said that during jury selection he raised the issue of a fair trial with the trial court because he feared the jurors were familiar with the Petitioner's case. He said that he wanted the court to allow individual questioning of the jurors and that the court granted his request. He said individually questioning jurors was the standard procedure when pretrial exposure was an issue. He said he had never been successful in arguing for a change of venue.

Trial counsel testified that he did not think Mr. Rhoads's testimony conflicted with the Petitioner's testimony at the trial. With regard to counsel's failure to highlight the problems in the divorce case, he said that he did not want to open the door to the divorce because there were facts in the divorce file that would have been unfavorable to the Petitioner.

On redirect examination, trial counsel testified that with regard to self defense, jurors were instructed to look at the facts from the defendant's subjective point of view. He recalled discussing the Petitioner's belief that he had been threatened. He did not recall the Petitioner's telling him about "lamps being trashed" inside his home. He agreed that a previous threat along with someone, whom he did not know, coming up behind him inside his home might cause someone to fear imminent bodily injury. He said, though, that based on the Petitioner's covering up the victim's death and the Petitioner's behavior following the killing, he believed the jury would have had a difficult time believing the Petitioner acted in self defense.

Trial counsel testified that before he told the jury the Petitioner was guilty of manslaughter, he and co-counsel advised the Petitioner of his constitutional right requiring the State to prove beyond a reasonable doubt each element of manslaughter. He denied that the Petitioner signed a written waiver. He said he and co-counsel believed that was the Petitioner's "best shot" of avoiding a first degree murder conviction.

Trial counsel testified that Mr. Rhoads's testimony about how the killing occurred was different from the Petitioner's version. He agreed Mr. Rhoads testified that the Petitioner said the victim was "suddenly there in his face yelling." He said he and co-counsel spoke to Mr. Rhoads "extensively" before the trial. He said that he expected Mr. Rhoads's testimony to be more consistent with the Petitioner's version.

Trial counsel testified that co-counsel's license to practice law was suspended. He denied that co-counsel's suspension was based on the failure to include the transcripts of the trial in the appellate record.

On recross-examination, trial counsel testified that people sometimes remembered things differently. He said he and co-counsel did not want a new trial on appeal because they did not want the Petitioner to face the possibility of a first degree murder conviction in a second trial. He believed there was a "substantial likelihood" that the Petitioner would be convicted of first degree murder during a second trial. He denied that co-counsel appeared to be under the influence of alcohol or other intoxicants during the trial or appellate process. On further redirect examination, counsel stated that he thought the Petitioner received the best possible outcome during the first trial.

Co-counsel testified that he worked on the Petitioner's appeal, that the Petitioner's sentence was the only issue raised on appeal, and that the strategy was discussed with the Petitioner before the trial and before the deadline to file a motion for a new trial. He said that all the pretrial issues were settled before the trial, that six objections were made during the four-day trial, and that he did not find any appellate issues with the trial, jury deliberations, or verdict. He stated that he and the Petitioner discussed appealing only the sentence and that the Petitioner did not say he wanted his conviction appealed. He agreed the appeal was successful in lowering the Petitioner's sentence by six years. He said he never included a trial transcript in the appellate record when the sentence was the only issue.

Co-counsel testified that although Dr. Harlan did not testify that particles were found in the victim's lungs, the presentence report stated particles were found in her lungs. He said he should have caught the error. He said that he did a lot of research regarding sentencing and that his primary focus was having this court reverse the trial court's ordering consecutive sentencing.

Co-counsel testified that he discussed with trial counsel and other attorneys in his firm the strategy to tell the jury the Petitioner was guilty of manslaughter. He said he used the strategy before when he worked in the Judge Advocate General's Office in the Navy Department. He said the State had a "great" case based upon circumstantial evidence and presented approximately forty witnesses. He said he thought the circumstantial evidence was going to "bury" the Petitioner. He believed the Petitioner had to testify at the trial to prevent his being convicted of first degree murder. He said he and trial counsel believed that admitting to voluntary manslaughter was the only way to prevent a first degree murder conviction. He said he and the Petitioner discussed the strategy "about twenty-five times" in the year before the trial. He said the Petitioner never stated that he did not want counsel to use this strategy. He stated that with regard to the Petitioner's duct taping the victim's

-11-

hands, feet, and face, placing the victim's body in the shed, and later placing the victim's body in a boat and burying her on an island, he argued the Petitioner's "incompetent[]" behavior showed a lack of premeditation.

Co-counsel testified that before the trial, he knew generally about Dr. Harlan's problems with the medical board, although he denied knowing any specifics. He said he and an associate met with Dr. Harlan three or four months before the trial for about five or six hours. He said he did not cross-examine Dr. Harlan about his pending prosecution with the medical board because Dr. Harlan gave counsel exactly what they wanted. He said he spent much of his cross-examination discrediting Dr. Harlan's conclusion that the victim suffocated, including highlighting the lack of petechial hemorrhages. He said Dr. Harlan had not lost his medical license at the time of the trial.

Co-counsel testified that he did not ask for a change of venue because he did not think the trial court would grant the request. He said they addressed their concern by individually questioning potential jurors in an anteroom. He thought that any potential jurors who were affected by the pretrial publicity were excused from the panel and that they had the jury they wanted.

Co-counsel testified that he did not ask Mr. Rhoads to testify about the threats the Petitioner received from the victim's family months before the killing because he made a tactical decision that the threats were self-serving evidence and because the evidence was inadmissible hearsay. He said he thought some evidence of the threats was going to be presented during the testimony of some of the State's witnesses. He said that the Petitioner and Mr. Rhoads were close and that the Petitioner wanted Mr. Rhoads to testify.

Co-counsel testified that self defense was not supported by the facts. He said the victim only weighed about 105 pounds. He said the Petitioner told him that the victim had a "bad temper" but denied the Petitioner's telling him that the victim was "out to get him, or . . . that he was seriously threatened by it." He did not recall the Petitioner's discussing anything that rose to the level of serious bodily injury or death. He recalled, though, that the Petitioner thought people entered his home and slashed his tires. He said he spoke to someone at the sheriff's department and expressed the Petitioner's concerns. Co-counsel stated that he thought the Franklin County Sheriff's Department did a professional job in the Petitioner's case. He said an investigator was hired but did not find evidence that any of the deputies threatened, extorted, or intimidated the Petitioner.

Co-counsel testified that he did not file a petition for a writ of error coram nobis when he learned that Dr. Harlan's medical license was suspended. He said that Dr. Harlan's credibility was not a "serious issue" and that there was no new evidence related to the victim's autopsy.

On cross-examination, co-counsel testified that his law license was suspended for fourteen months because of a substance abuse problem and that he received a censure for his failure to include the trial transcript in the Petitioner's appeal. He agreed he pleaded guilty to theft over $10,000 as a result of misappropriation of law firm money.

Co-counsel testified that he was primarily responsible for the sentencing hearing and the appeal. He said that he did not object to the statement in the presentence report that duct tape particles were found in the victim's lungs. He agreed that Dr. Harlan never made such a finding in his reports or testimony. He agreed this court concluded in the appeal of the Petitioner's sentence that the trial court did not err in finding that the victim was subjected to cruelty and torture and in enhancing the Petitioner's sentence. He agreed this court concluded that the victim tried to continue breathing and suffocated.

Co-counsel testified that he heard rumors about Dr. Harlan's bizarre behavior before the trial and denied that he heard Dr. Harlan falsified records. He denied knowing that Dr. Harlan was accused of not performing a skeletal survey during a 2001 autopsy and said if he and trial counsel would have known this information, they would have "exploited it" at the trial. He believed the allegation arose after the trial. He said that he asked Dr. Harlan's attorney about the problems with the medical board.

Co-Counsel testified that Dr. Harlan could not testify to a reasonable degree of medical certainty that the victim struggled before her death. He agreed that Dr. Harlan told him before the trial that he had performed ten autopsies in which a victim had been duct taped and that most of the victims were killed before the duct tape was applied. He agreed he did not cross-examine Dr. Harlan about these statements. He agreed Dr. Harlan testified that the duct tape was the only evidence of suffocation.

Co-counsel testified that at the trial, he did not ask Mr. Rhoads about the threats because Mr. Rhoads was the last witness and he thought the evidence was self-serving. He said the evidence of the threats was admitted through other witnesses. After reviewing the trial transcript, he agreed that there were two witnesses after Mr. Rhoads, that one of those witnesses was Carla Zajac, the Petitioner's sister, and that she testified about the threats. He denied that a jury might credit the testimony of the Petitioner's sister over that of a pastor. He agreed the Petitioner's letters stated that Mr. Rhoads could testify about the Petitioner's taking a handgun for protection because of the threats he received and his parking behind Mr.

-13-

Rhoads's church to avoid any problems with the victim and her family. He said the Petitioner told him about his tires being slashed and people breaking into his home.

Co-counsel testified that he admitted during opening statements that the Petitioner was guilty of manslaughter, although he knew the Petitioner had the right to have the State prove each element of an offense beyond a reasonable doubt. He denied the Petitioner signed a waiver of his constitutional right to have the state prove each element of the offense. He denied the Petitioner signed a waiver to appeal his convictions.

Co-counsel testified that by not filing a notice of appeal, he waived the right to raise sufficiency of the evidence on appeal. He said that from the time the Petitioner retained him to about six months after the trial, the Petitioner's version of events did not change. He said he and trial counsel thought self defense and criminally negligent homicide theories were not believable and would sacrifice credibility with the jury. He said the Petitioner told him that he expected the victim to come to the Petitioner's home after work to pick up their children.

Co-counsel testified that he did not order a trial transcript, although he knew the trial court was required to look at the evidence presented at the trial and the sentencing hearing and the information contained in the presentence report when determining the proper sentence. He said that although he did not include a transcript of the trial in the appellate record, he and trial counsel believed all the relevant information and evidence was contained in the sentencing hearing transcript. He denied receiving letters from the Petitioner stating that he did or did not want to waive his right to appeal his convictions.

Co-counsel testified that during jury selection, almost all the potential jurors said they had heard something about the Petitioner's case and that ten of the twelve jurors had some form of pretrial publicity exposure. He agreed one of the jurors said during jury selection that he thought it was a "heinous crime." He agreed another juror said he discussed this case with a friend who worked with the county rescue squad and agreed a third juror worked at the same place as the victim.

Co-counsel testified that he interviewed Mr. Rhoads many times before the trial and that Mr. Rhoads's testimony was consistent with his previous interviews. He said he thought Mr. Rhoads's testimony that the Petitioner told him the victim was "in his face yelling" was somewhat consistent with the statements made during the interviews. He said Mr. Rhoads's testimony was consistent enough with the Petitioner's version of events.

On redirect examination, co-counsel testified that he did not have a substance abuse problem during his representation of the Petitioner. He said his substance abuse stemmed from a spring 2007 car accident, which was after the supreme court denied the Petitioner's

application for permission to appeal. He agreed this court relied on factors other than the statement in the presentence report that Dr. Harlan found particles of duct tape in the victim's lungs.

The trial court denied relief. Regarding trial counsel failing to appeal the Petitioner's convictions, the court concluded that counsel were not ineffective. The court credited counsel's testimony. It found that trial counsel and co-counsel discussed the appeal and concluded that there "were no legitimate issues to appeal, other than sentencing issues." Counsel agreed that the acquittal of first degree murder was a success. The court noted counsel's success on appeal and the sentence reduction from thirty to twenty-four years. The court found that the Petitioner failed to present evidence showing that a reasonable probability existed that an appeal of his convictions would have been successful.

With regard to counsel's admitting the Petitioner was guilty of voluntary manslaughter during opening statements, the trial court concluded that the strategy was "reasonably based" and that it would not "second-guess the well thought-out tactical defense decision." The court credited counsel's testimony and concluded that counsel were not deficient. It found that counsel discussed this strategy with each other and other attorneys in their firm. The court found that they were "ethically locked into a certain set of facts . . . based on the Petitioner's admissions" to counsel "before the victim's body was found." The court credited counsel's testimony that self defense would have been difficult to establish because of the Petitioner's "elaborate 'cover-up'" in concealing the victim's body. The court found that the strategy of admitting the Petitioner's guilt to manslaughter was discussed with the Petitioner before the trial and that the Petitioner agreed to the strategy. Counsel told the Petitioner that he would be convicted of some level of homicide but that the goal was to avoid a first degree murder conviction. The court stated that the strategy was "perhaps brilliant" and that given the amount of evidence against the Petitioner, "the strategy likely played a role in avoiding a first-degree murder conviction."

With regard to counsel's failure to investigate Dr. Harlan's problems with the state medical board and their failure to cross-examine Dr. Harlan adequately, the trial court found that counsel were not deficient. The court found that co-counsel discussed with Dr. Harlan the autopsy findings before the trial. The court found that although co-counsel was aware of the allegations against Dr. Harlan, his medical license was not permanently revoked until six months after the Petitioner's trial. It found that co-counsel chose not to question Dr. Harlan about the medical board proceedings because Dr. Harlan provided favorable testimony about the cause of death and lack of petechial hemorrhaging in the victim's eyes. The court found that co-counsel's cross-examination was "within the range of competence demanded of attorneys in criminal cases" and that his failure to question Dr. Harlan about the medical board proceedings was a "reasonable tactic."

-15-

With regard to the erroneous statement in the presentence report regarding duct tape particles in the victim's lungs, the trial court found that co-counsel admitted he should have seen the error and objected. The court concluded that co-counsel was deficient by failing to object. With regard to counsel's failure to include a trial transcript in the appellate record, the court found that counsel were not deficient. The court found that because co-counsel only appealed the Petitioner's sentence, he did not believe a transcript was necessary for the relief sought and that the evidence contained in the transcript might have prevented appellate relief. The court found that co-counsel and trial counsel discussed whether to include the transcript and agreed a transcript was not required or beneficial to the sentencing issues. It noted that although this court "included the incorrect 'duct tape in the lung' comment when it discussed the exceptional cruelty as a sentencing factor," this court included other factors supporting the enhancement factor. The court concluded that the Petitioner failed to establish that this court would have ruled differently had counsel included the trial transcript on appeal.

With regard to counsel's failure to request jury instructions on lesser included offenses, the trial court concluded that counsel were not deficient. The court found that counsel's sound and reasonable trial strategy of admitting guilt to voluntary manslaughter prevented the court's giving instructions on reckless and criminally negligent homicide.

With regard to counsel's failure to request a change of venue after the Petitioner's case received pretrial publicity, the trial court found that counsel were not deficient. The court credited counsel's testimony that counsel believed a motion for a change of venue would be denied and that any concerns related to the Petitioner's ability to obtain a fair trial were addressed through individual voir dire. The court found that the Petitioner failed to present any evidence that the jurors were "wrongly influenced by pretrial publicity or notoriety."

With regard to trial counsel's failure to interview Barry Rhoads adequately before the trial, the trial court found that trial counsel and co-counsel interviewed Mr. Rhoads before the trial and that they thought Mr. Rhoads's testimony would be consistent with the Petitioner's testimony at the trial. The court stated that the trial transcript supported counsel's testimony.

The trial court discredited the Petitioner's testimony. It found that the Petitioner's testimony that he fabricated his version of events because of threats and extortion was "totally unbelievable." It found that the Petitioner's allegations that he was threatened and extorted by two sheriff's deputies was "totally unsupported by any evidence, credible or otherwise." This appeal followed.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2012).

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the Petitioner must also show that but for the substandard performance, a reasonable probability exists that "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." Id.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). See Baxter, 523 S.W.2d at 936. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular

strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201.

## I

The Petitioner contends that co-counsel was ineffective by failing to object to the erroneous statement in the presentence report that duct tape particles were found in the victim's lungs and by failing to include the trial transcript in the appellate record. He argues that the failure to object to the erroneous statement was compounded by the failure to include the transcript in the appellate record in order for this court to consider the appropriate sentence. The State responds that the Petitioner was not prejudiced by counsel's failure to object to the statement contained in the presentence report or counsel's failure to include the transcript. We agree with the State.

We conclude that co-counsel was deficient by failing to object to the erroneous statement included in the presentence report. Co-counsel admitted his deficiency at the post-conviction hearing and said Dr. Harlan did not testify at the trial about duct tape particles found in the victim's lungs. Co-counsel also admitted that the autopsy report did not include such a finding. In addressing the trial court's enhancement of the Petitioner's sentence based on his treating the victim with exceptional cruelty, this court looked to factors other than the presence of duct tape particles in the victim's lungs. This court concluded that the enhancement factor was properly applied because the Petitioner bound the victim's hands and feet, covered her mouth and nose with duct tape, and killed the victim while their children were sleeping upstairs. See Lonnie Lee Owens, slip op. at 6. Although this court included the improper statement in its reasoning for upholding the trial court's sentence enhancement, there were other factors upon which the court relied.

At the trial, Dr. Harlan testified that the victim's wrists, ankles, and head were duct taped, that the wrists were taped behind the victim's back, and that the tape around the head was wrapped in a circular pattern and covered the nose, mouth, and the upper portion of the chin. Dr. Harlan concluded that the cause of death was suffocation because the duct tape blocked the victim's nose and mouth. He stated that had the victim been struck in the head with enough force to cause her death, he would have expected to find bleeding beneath the outer membrane surrounding the brain, bruising to the brain, fractures to the skull or face, or tearing of the skin. He found no evidence of these injuries and excluded blunt force trauma as the victim's cause of death. Dr. Harlan did not find evidence of petechial hemorrhaging in the victim's eyes but stated that petechia was not always present after

suffocation and that the condition of the victim's eyes were poor because of exposure. We cannot conclude that a reasonable probability exists that the sentencing outcome would have been different had counsel objected to the statement in the presentence report.

With regard to trial counsel's failure to include a trial transcript in the appellate record because he thought the transcript would prevent this court's granting sentencing relief, his decision would have the opposite effect. "[T]here is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993) (citing State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983)). Although counsel only appealed the Petitioner's sentence, the trial proceedings were relevant to the issue of enhancing the petitioner's sentence. See T.C.A. § 40-35-210(b)(1) (2010) (requiring a trial court to consider evidence presented at the trial in making its sentencing determinations). Counsel's failure constituted deficient performance. Although the presentence report refers to Dr. Harlan's conclusion on the victim's cause of death, the trial transcript would have highlighted the inaccurate statement in the presentence report regarding the duct tape particles being found in the victim's lungs. The discrepancy went unnoticed because counsel failed to include the trial transcript in the appellate record. We agree, though, that the victim was treated with exceptional cruelty and cannot conclude that a reasonable probability exists that but for counsel's deficient performance, the result of the proceeding would have been different. The Petitioner has failed to establish prejudice.

## II

The Petitioner contends that co-counsel was ineffective by cross-examining Dr. Charles Harlan inadequately. He argues that co-counsel failed to elicit favorable testimony about the victim's cause of death and failed to question Dr. Harlan about the pending proceedings to revoke his medical license. The State responds that co-counsel's cross-examination was professionally reasonable and did not prejudice the Petitioner. We agree with the State.

Dr. Charles Harlan testified at the trial that the victim's cause of death was suffocation because he found no diseases or injuries consistent with blunt force trauma and because the victim's airway was blocked by duct tape. During co-counsel's cross-examination, Dr. Harlan testified that of the many thousands of autopsies he had performed, less than ten involved suffocation by duct tape. He said that although he concluded the cause of death was suffocation, he did not find any evidence supporting his conclusion other than the duct tape over the victim's mouth and nose. Dr. Harlan could not state with a reasonable degree of medical certainty that the victim was conscious before the duct tape was applied. He stated

that a person could receive a "blow" that caused unconsciousness but did not "leave a mark. . . ." He agreed that someone who was unconscious might look dead.

Dr. Harlan testified that petechial hemorrhaging was caused when the smallest blood vessels in the body ruptured and that it could be seen in the eyes as a result of suffocation. He said, though, that petechia was not required to diagnose suffocation. He said petechia supported such a conclusion but was not necessary. Dr. Harlan did not see petechia in the victim's eyes, face, lungs, or neck.

The Petitioner argues that co-counsel should have questioned Dr. Harlan about the ten cases in which he performed autopsies involving duct tape and his conclusions that most of the victims were dead before the tape was applied. The Petitioner also argues that co-counsel should have questioned Dr. Harlan about his failure to find evidence that the victim "thrash[ed] around" when Dr. Harlan told co-counsel before the trial that individuals who die as a result of suffocation "thrash around." We cannot conclude that co-counsel was deficient by failing to ask Dr. Harlan these questions. Co-counsel highlighted during cross-examination that although Dr. Harlan concluded the victim suffocated, there was no evidence supporting his conclusion other than the duct tape. Dr. Harlan could not determine if the victim was conscious or unconscious when the duct tape was applied to the victim's hands, feet, and face. He agreed it was possible for a victim to receive a blow that caused unconsciousness but left no evidence of an internal or external wound. Dr. Harlan found no evidence of petechia but concluded suffocation did not always result in petechial hemorrhaging. Co-counsel presented evidence that it was possible the victim's cause of death was not suffocation as Dr. Harlan concluded and that she was rendered unconscious by a blunt force trauma, preventing the victim's struggling.

With regard to co-counsel's failure to impeach Dr. Harlan with the pending proceeding to revoke Dr. Harlan's medical license, we cannot conclude that co-counsel provided deficient performance. The Petitioner's trial was held in November 2004, and Dr. Harlan's medical license was permanently revoked in May 2005. Although co-counsel knew about the pending proceedings, he denied knowing the substance of the allegations and said he contacted Dr. Harlan's attorney before the trial to investigate the pending proceedings.

In any event, co-counsel elicited favorable testimony about whether the victim suffocated and whether the victim was conscious at the time the duct tape was applied. Co-counsel made the tactical decision not to question Dr. Harlan about the pending medical board proceeding because Dr. Harlan gave counsel exactly what counsel wanted. Because co-counsel made an informed tactical decision, we cannot conclude that co-counsel provided deficient performance. See Hellard, 629 S.W.2d at 9.

### III

The Petitioner contends that trial counsel was ineffective by "attempting to negotiate a plea agreement in the jury's presence." He argues that he did not waive his right requiring the State to prove that he acted with the required mens rea and intent for voluntary manslaughter. The State responds that counsel's decision to acknowledge voluntary manslaughter in the jury's presence was a tactical and strategic decision and did not constitute deficient performance. We agree with the State.

After the indictment was read, co-counsel attempted to enter a plea to voluntary manslaughter. The trial court rejected the plea and submitted the case to the jury. During co-counsel's opening statement, counsel discussed the elements of first and second degree murder and told the jurors that the Petitioner accepted responsibility for voluntary manslaughter, a killing in the heat of passion with adequate provocation.

Although the Petitioner did not sign a written waiver allowing trial counsel to argue before the jury that he was guilty of voluntary manslaughter, counsel's credited testimony was that the Petitioner consented to the trial strategy. Co-counsel stated that this strategy was discussed with the Petitioner "about twenty-five times" in the year before the trial. He said the Petitioner never stated that he did not want counsel to use this strategy. Trial counsel said his attempting to plead guilty to voluntary manslaughter and asking the jury for a manslaughter conviction during opening statements was part of their strategy. Counsel discussed the strategy with other attorneys in their firm long before the trial. Trial counsel stated that the strategy was discussed with the Petitioner and that the Petitioner agreed the strategy might be successful. Counsel advised the Petitioner of his constitutional right requiring the State to prove beyond a reasonable doubt each element of manslaughter. Counsel believed that this strategy was the Petitioner's "best shot" of avoiding a first degree murder conviction and that manslaughter was consistent with the Petitioner's burying the victim's body in a remote location. We cannot conclude that the evidence preponderates against the trial court's conclusion that the strategy was reasonable given the facts of the case.

### IV

The Petitioner contends that trial counsel provided ineffective assistance by failing to request jury instructions on the lesser included offenses of criminally negligent and reckless homicide. He argues that although the trial court stated that it would not instruct the jury on any lesser included offenses of voluntary manslaughter based on counsel's statements during opening statements and closing arguments, counsel should have objected to the

court's refusal. The State responds that counsel were not ineffective. We agree that the Petitioner is not entitled to relief.

In criminal cases, the trial court has the duty to charge the jury on all the law that applies to the facts of the case. See State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992) (citing State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975)). The Defendant also "has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." Thompson, 519 S.W.2d at 792; see T.C.A. § 39-11-203(c) (2010) (entitling a defendant to have the issue of the existence of a defense submitted to the jury when it is fairly raised by the proof). An erroneous jury instruction may deprive the defendant of the constitutional right to a jury trial. See State v. Garrison, 40 S.W.3d 426, 433-34 (Tenn. 2000). A jury instruction must be reviewed in its entirety and read as a whole rather than in isolation. State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004). An instruction will be considered prejudicially erroneous only if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)). A trial court should give an "instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law." State v. Phipps, 883 S.W.2d 138, 150 n.20 (Tenn. Crim. App. 1994). Counsel may provide ineffective assistance by failing to request jury instructions on applicable lesser included offenses. Jimmy Dale Hogan v. State, No. M2007-02104-CCA-RM-CD, slip op. at 2-3 (Tenn. Crim. App. Aug. 12, 2008).

Trial counsel's credited testimony shows that he believed the Petitioner's duct taping the victim's hands, feet, and face, hiding the victim's body in a shed, burying the victim's body on a remote lake island, and concealing the victim's death made it difficult for counsel to argue in favor of reckless homicide, negligent homicide, and self defense. Admitting guilt to manslaughter was part of counsel's strategy, and the Petitioner agreed to concede guilt. The strategy was discussed with other attorneys in counsel's firm and contemplated for about one year before the trial. Counsel thought voluntary manslaughter was consistent with the Petitioner's disposing and burying the victim's body in a remote location and was the best strategy to avoid a first degree murder conviction. Co-counsel's credited testimony shows that he also thought the Petitioner's only chance of avoiding a first degree murder conviction was to admit guilt to voluntary manslaughter. The strategy was discussed with the Petitioner numerous times in the year leading to the trial, and the Petitioner never told counsel that he did not want to admit guilt to manslaughter.

The Petitioner testified at the trial that he was home with his children when he heard the voice of someone he did not know behind him and that he reacted by hitting the person. The Petitioner said that by the time he realized it was the victim, she was already dead and that he panicked. We conclude that regardless of counsel's admitting guilt to voluntary

-22-

manslaughter, counsel should have requested jury instructions on reckless and criminally negligent homicide because they were supported by the trial testimony and did not conflict with the Petitioner's theory of the case. Failure to request these instructions was deficient performance. We also conclude that the trial court should have provided the instructions regardless of counsel's failure to request them. We conclude, though, that the Petitioner has not established prejudice based on the jury's finding the Petitioner guilty of second degree murder. The jury rejected voluntary manslaughter. See State v. Williams, 977 S.W.2d 101, 104-07 (Tenn. 1998).

**V**

The Petitioner contends that trial counsel and co-counsel were ineffective by failing to interview Barry Rhoads before the trial. Alternatively, he contends that if counsel interviewed Mr. Rhoads before the trial, counsel were ineffective by failing to investigate adequately the substance of Mr. Rhoads's trial testimony. He argues that counsel should have presented evidence that the Petitioner felt threatened and that counsel should not have questioned Mr. Rhoads about the substance of the Petitioner's confession because it undermined the Petitioner's claim of self defense. The State responds that Mr. Rhoads was interviewed before the trial and that counsel were not deficient. We agree with the State.

Although counsel does not have an absolute duty to investigate particular facts or a certain line of defense, counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. Strickland, 466 U.S. at 691. Counsel is not required to interview every conceivable witness. See Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). Furthermore,

> no particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted).

A reasonable investigation does not require counsel to "leave no stone unturned." Perry Anthony Cribbs v. State, No. W2006-01381-CCA-R3-PD, slip op. at 57 (Tenn. Crim. App. July 1, 2009), perm. app. denied (Tenn. Dec. 21, 2009). Rather, "[r]easonableness should be guided by the circumstances of the case, including information provided by the defendant, conversations with the defendant, and consideration of readily available resources." Id. The United States Supreme Court has said, "inquiry into counsel's

-23-

conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." Strickland, 466 U.S. at 691.

Counsel interviewed Mr. Rhoads "extensively." Counsel were aware of the threats the Petitioner claimed to have received and reviewed the Petitioner's divorce attorney's file. Counsel concluded that although the threats could have supported a self defense theory, the facts of how the Petitioner said the killing occurred were inconsistent with self defense. Although the evidence could have been used to show the Petitioner's state of mind at the time of the killing, counsel decided not to question Mr. Rhoads about the threats. Counsel did not highlight the threats and the Petitioner's divorce because they did not want to open the door to the State's asking Mr. Rhoads questions about the divorce. Trial counsel concluded that the divorce case involved facts that were unfavorable to the Petitioner's first degree murder trial.

We note that the divorce file is not included in the appellate record and that counsel did not testify at the post-conviction hearing about the substance of the divorce file or the unfavorable facts they feared coming into evidence. Likewise, the record does not contain evidence supporting counsel's conclusion that the information contained in the divorce file would have been admissible at the trial. As a result, we cannot conclude that counsel made a reasonable, tactical decision without proof of the information counsel feared would be admitted at the trial and thought would damage the Petitioner's case. In any event, evidence of the threats was presented during the testimony of the Petitioner's sister, Carla Zajac. Counsel thought Mr. Rhoads's testimony would be consistent with the Petitioner's trial testimony, although Mr. Rhoads testified that before the killing the Petitioner said the victim was "in his face yelling." We conclude that without evidence about the information in the divorce file that concerned counsel, we cannot disagree with the trial court's crediting counsel's decision not to question Mr. Rhoads about the threats.

**VI**

The Petitioner contends that counsel were ineffective by failing to request a change of venue. He argues that counsel should have requested a change of venue because of the pretrial publicity. The State responds that counsel provided the effective assistance of counsel. We agree that the Petitioner is not entitled to relief.

A change of venue may be granted when it appears that because of "undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had." Tenn. R. Crim. P. 21(a). The decision to grant a motion for a change of venue is within the sound discretion of the trial court and will only

be reversed upon an abuse of discretion. State v. Howell, 868 S.W.2d 238, 249 (Tenn. 1993). A change of venue is not warranted merely because jurors have been exposed to pretrial publicity. State v. Mann, 959 S.W.2d 503, 531-32 (Tenn. 1997). Jurors "can have knowledge of the facts surrounding the crime and still be qualified to sit on the jury." State v. Crenshaw, 64 S.W.3d 374, 386 (Tenn. Crim. App. 2001). "The test is 'whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity.'" Id. (quoting State v. Kyger, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989)).

With regard to whether counsel should have requested a change of venue, counsel did not think a change of venue would be granted. Trial counsel had never successfully argued for a change of venue. Co-counsel said that although a change of venue was not requested, any concerns about the pretrial publicity were addressed during voir dire. We cannot conclude that the Petitioner was prejudiced by counsel's failure to request a change of venue.

Counsel raised their concern about the impact of the pretrial publicity, and the trial court allowed counsel and the prosecutor to voir dire in chambers each potential juror who indicated knowing about the Petitioner's case. The jurors who were prejudiced against the Petitioner because of the pretrial media exposure were excused from service. Counsel were satisfied with the jury empaneled to decide the case.

During voir dire, many of the potential jurors indicated that they had been exposed to various forms of pretrial publicity. Of the jurors who were questioned in chambers, two indicated that they had formed an opinion about the Petitioner's guilt based on the pretrial publicity and were excused from service. The information reported by the jurors included hearing that "the body was dumped," that the Petitioner was suspected of killing his wife, that the victim's body was found on a lake island, and that the victim was missing for a period of time.

One juror admitted working at the same company where the Petitioner worked but denied knowing the Petitioner. Another juror stated that a friend, who worked for the rescue squad, told him that he was part of the group that found the victim's body. He denied hearing any statements about who killed the victim and having formed an opinion about the Petitioner's guilt. Another juror stated that her adult children told her about the victim's being missing and that she heard about the case on the radio. She said her children went to school with someone whose last name was Owens but did not know if that person was related to the victim. She denied forming an opinion about the Petitioner's guilt.

Although the Petitioner raises issue with jury selection generally, he addresses the individual voir dire of juror Wayne Signs. Mr. Signs stated that he heard about the Petitioner's case in the newspapers and by talking to people in the community. He denied

-25-

talking to anyone who claimed to be a witness in the case or remembering the substance of the newspaper articles. He said that he probably formed an opinion about the case when the victim's death was initially reported in the news but that he had no opinion of the case at the time of voir dire. He said his initial opinion was that this was a "heinous crime" but denied forming an opinion about whether the Petitioner was innocent or guilty. He said he could evaluate the case based solely on the evidence and the trial court's instructions.

Although the jurors were exposed to pretrial publicity, the record shows that the jurors empaneled had not formed an opinion about the case or the Petitioner's innocence or guilt and were capable of evaluating the case based on the evidence presented and the trial court's instructions. We conclude that the Petitioner has failed to establish that the jurors were wrongly influenced by pretrial publicity. The Petitioner is not entitled to relief.

**VII**

The Petitioner contends that counsel were ineffective by failing to file a motion for a new trial and by failing to appeal his conviction. He argues that counsel's failure to file the motion for a new trial and to appeal his convictions prevented appellate review of the sufficiency of the evidence and that the evidence is insufficient. He also argues that James Koski's testimony at the trial about a statement the Petitioner made five years before the victim's death violated Tennessee Rule of Evidence 403 and that counsel waived the issue by failing to file the motion and to appeal his convictions. The State responds that the Petitioner was not denied his right to appeal his conviction. We agree that the Petitioner is not entitled to relief.

The record shows that counsel and the Petitioner discussed whether to appeal the Petitioner's convictions and that they agreed the best opportunity for appellate relief was to appeal the sentence. Although trial counsel testified that he feared the Petitioner would be tried again for first degree murder if this court granted relief from the conviction, a wholly unfounded fear given double jeopardy protections, co-counsel denied this was a factor in determining whether to appeal the conviction. Co-counsel, who worked on the Petitioner's appeal, did not think there were any meritorious issues regarding the conviction. The Petitioner argues counsel should have raised sufficiency of the evidence and an evidentiary issue on appeal. We cannot conclude that the Petitioner was prejudiced.

With regard to the sufficiency of the evidence, we conclude that the evidence was sufficient to sustain the Petitioner's conviction for second degree murder. See T.C.A. § 39-13-210 (2010) (stating that second degree murder is the knowing killing of another); see also T.C.A. §39-11-106(20) (2010) (stating that "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain

to cause the result"). The evidence showed that the Petitioner admitted striking the victim in the head, duct taping her hands and feet, duct taping her face from her nose to her chin, concealing her body, transporting her body to an island on Tim's Ford Lake, and burying the victim's body in a shallow grave. Various witnesses testified about the Defendant and the victim's pending divorce, inability to get along around the time of the victim's disappearance, and fighting over their two children.

The victim was last seen leaving work at 3:11 p.m. the day she disappeared. Greg Arp, the victim's coworker and boyfriend, and the victim discussed their evening plans during their lunch break. The victim called the Petitioner's home to speak with her children during lunch, but the Petitioner did not allow her to speak with them. Mr. Arp said that after work, the victim was supposed to pick up her children at the Petitioner's home, bring the children to Mr. Arp's home, and go to dinner together. Mr. Arp called the victim's cell and home phones around 3:30 or 4:00 p.m. because the victim had not arrived at his home with her children. He said that he was unable to reach her and that the victim did not return his calls.

Kara Matthews, the Petitioner's girlfriend at the time of the killing, said she arrived at the Petitioner's home around 4:30 or 5:00 p.m. the day the victim disappeared and that the Petitioner was pacing the kitchen floor, was sweating, and was nervous. The Petitioner told her a story about some of his friends suggesting that they steal the victim's truck. The Petitioner told her that he believed they were joking but that someone arrived at his home with the victim's keys thirty minutes before she arrived. The Petitioner said his friends left the truck in Kroger's parking lot. Ms. Matthews said the Petitioner requested that she drive him to the parking lot to find the victim's truck. She said that the truck was in the Advanced Auto Parts' parking lot, which was in the same strip mall as Kroger. She stated that the Petitioner got into the truck, that he told her he was going to take the truck back to his friend, and that she followed him. She said the Petitioner drove the truck to "Smokehouse and hotel" and wiped the steering wheel and the door with a cloth. He left the keys inside the truck. She said they went to buy fast food. She said the Petitioner acted "normal" after they left the truck. She stated that after they returned home, the Petitioner asked her to watch his children for a while.

The Petitioner told Mr. Rhoads that he killed the victim. According to Mr. Rhoads's testimony, the Petitioner said he had just put the children down for their naps when the victim appeared in the kitchen. The Petitioner stated that the victim was yelling at him and that before he knew what happened, he hit the victim, who fell to the floor. The cause of death, though, was suffocation. The medical examiner concluded the victim suffocated from the duct tape obstructing her airway. The autopsy did not show evidence of blunt force trauma

to the victim's head, contradicting the Petitioner's version of events. We conclude the evidence was sufficient.

With regard to the evidentiary issue, James Koski testified about his and the Petitioner's familiarity with Tim's Ford Lake, their fishing the area, and their discussing camping in the area where the victim's body was found. He stated that in 1999, about four or five years before the killing, the Petitioner told him about his marital problems. He said the Petitioner told him that the victim could leave but that the Petitioner would kill her if she attempted to take his children. He agreed he did not think the Petitioner was serious about killing the victim. Counsel objected to the testimony as being too remote in time in relation to the killing. The court overruled the objection.

Tennessee Rule of Evidence 403 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." We conclude that although the statement was made four or five years before the victim's death, the trial court did not err by admitting the statement. See State v. Wilson, 164 S.W.3d 355 (Tenn. Crim. App. 2003) (concluding that the trial court did not err by admitting evidence of a five-year-old protective order awarding the victim custody of the defendant's son because the order was relevant to the issue of motive to commit murder). Other witnesses testified about the marital difficulties between the Petitioner and the victim, including the Petitioner's desire to maintain custody of his children. The Petitioner is not entitled to relief.

**VIII**

The Petitioner contends that the cumulative effect of counsel's errors deprived him of the effective assistance of counsel. The State responds that the cumulative error doctrine does not apply. We agree that the Petitioner is not entitled to relief.

Our supreme court has stated that "'the combination of multiple errors may necessitate the reversal . . . even if individual errors do not require relief.'" State v. Jordan, 325 S.W.3d 1, 79 (Tenn. 2010) (quoting State v. Cribbs, 967 S.W.2d 773, 789 (Tenn. 1998)). This court has stated, "when an attorney has made a series of errors that prevents the proper presentation of a defense, it is appropriate to consider the cumulative impact of the errors in assessing prejudice." Timothy Terell McKinney v. State, W2006-02132-CCA-R3-PD, slip op. at 37 (Tenn. Crim. App. Mar. 9, 2010) (citing Harris ex rel Ramseyer v. Wood, 64 F.3d 1432, 1438 (9th Cir. 1995), cert. denied, 490 U.S. 1075 (1989)), perm. app. denied (Tenn. Aug. 25, 2010). "The reviewing court does not ask as to whether the defendant is innocent of the crime. The question remains whether the defendant was deprived of a reasonable chance of acquittal due to his counsel's performance." Id.

We have concluded that counsel were deficient by failing to object to the erroneous statement contained in the presentence report, by failing to include the trial transcript in the appellate record, by failing to request jury instructions on reckless and criminally negligent homicide, by failing to file a motion for a new trial and to appeal the second degree murder conviction, and by failing to request a change of venue. We have also concluded that the Petitioner failed to establish prejudice on each of these grounds. We cannot conclude, though, that there was cumulative error, that the Petitioner was deprived of the effective assistance of counsel, or that he was deprived of a reasonable chance of acquittal.

**IX**

The Petitioner contends that he is entitled to a delayed appeal. He argues that counsel failed to comply with Tennessee Rule of Criminal Procedure 37(d)(2) and that counsel failed to withdraw as counsel of record, preventing the Petitioner from appealing his conviction pro se. The State responds that the Defendant is not entitled to a delayed appeal. We agree with the State.

Tennessee Rule of Criminal Procedure 37(d)(2) states that

[b]efore a judgment on the guilty verdict becomes final the following shall be done: If a[] . . . defendant who has the right to appeal a conviction chooses to waive the appeal, counsel for the defendant shall file with the clerk, during the time within which the notice of appeal could have been filed, a written waiver of appeal, which must

(A) clearly reflect that the defendant is aware of the right to appeal and voluntarily waives it;

(B) be signed by the defendant and the defendant's counsel of record.

The evidence shows that counsel failed to obtain a written waiver from the Petitioner showing his intent to waive an appeal of his conviction for second degree murder. We cannot conclude, though, that the Petitioner is entitled to a delayed appeal.

A petitioner is entitled to a delayed appeal under the Post-Conviction Procedure Act when the petitioner has been "denied the right to an appeal from the original conviction." T.C.A. § 40-30-113(a) (2012); see State v. Evans, 108 S.W.3d 231, 235-36 (Tenn. 2003). A delayed appeal may be granted when the petitioner has been denied the effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution. Wallace v. State, 121 S.W.3d 653, 656 (Tenn.

2003). Appellate courts determine whether there has been a denial of the effective assistance of counsel by applying the two-pronged test established in <u>Strickland v. Washington</u>.

Although counsel failed to comply with Rule 37(d), counsel sought appellate relief with regard to the Petitioner's sentence and informed the Petitioner of his right to appeal his conviction. Counsel and the Petitioner agreed the best course of action was to appeal only his sentence. Co-counsel stated that the Petitioner never expressed a desire to appeal his conviction.

Counsel discussed with another attorney in their firm and the Petitioner whether to appeal the Petitioner's conviction and decided the best opportunity for appellate relief was to appeal his sentence and agreed there were no other meritorious issues to raise on appeal. Counsel discussed the strategy with the Petitioner before the trial and before the deadline to file the motion for a new trial. Counsel noted that six objections were made during the trial and that he did not believe they were worthy of appellate relief. Although trial counsel incorrectly feared that the Petitioner could be tried for first degree murder if an appeal of his conviction were successful, trial counsel was not responsible for the appeal. Co-counsel denied this was the reason he did not appeal the Petitioner's conviction. Co-counsel believed that given the evidence of the Petitioner's duct taping the victim's hands, feet, and face, hiding her body, burying her body in a shallow grave on a lake island, and the witness testimony prevented a successful appeal of his conviction. We previously concluded that counsel were deficient by failing to include the trial transcript in the appellate record and that the evidence was sufficient to sustain the Petitioner's conviction for second degree murder. We note that a trial court is required to consider the evidence presented at the trial in making its sentencing determination, making the trial transcript relevant for appellate relief of sentencing. <u>See</u> T.C.A. § 40-35-210(b)(1) (2010). The Petitioner failed to present any evidence at the post-conviction hearing showing there was a reasonable probability that an appeal of his conviction would have been successful. The Petitioner is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE